## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SIMEON JOEL BRIGGS,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:19-0319** |
| **v.** | : | **(JUDGE MANNION)** |
| **A. BROCKMAN,** *et al.*, | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

### I. <u>Background</u>

Plaintiff, Simeon Joel Briggs, an inmate formerly housed[1] in the United States Penitentiary, Lewisburg, Pennsylvania, filed the above captioned <u>Bivens</u>[2] federal civil rights action pursuant to 28 U.S.C. §1331 and Federal Tort Claims Action, pursuant to 28 U.S.C. §1346(b).[3] (Doc. 1). The named Defendants are the United States of America and the following Bureau of

---

[1] Plaintiff was released from BOP custody on January 17, 2020. https://www.bop.gov/inmateloc/. He is currently in the custody of the Rhode Island Department of Corrections and is housed at the High Security Center, P.O. Box 8200, Cranston, Rhode Island, 02920.

[2] <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,</u> 403 U.S. 388 (1971).

[3] Incorporated in the above captioned action is <u>Briggs v. U.S., et al.</u>, Civil Action No. 3:19-cv-1499. This action raised the same allegations as the complaint herein, as well as named the same Defendants. <u>Id</u>. Thus, by Order dated January 5, 2021, the action was consolidated into the instant action. <u>Id</u>.

Prisons (BOP) employees: Chief Psychologist Jennifer Enigk, Psychologist Andrea Brockman and Psychology Staff Member Rachel Eigenbrode.

Plaintiff alleges that the Defendants violated his Eighth Amendment rights by "neglecting to treat him for a mental health disorder, denying him access to his meeting with a psychiatrist, and refusing him medication. (Doc. 1, complaint). For relief, he seeks compensatory and punitive damages, as well as a Court ordered evaluation by a psychiatrist, as well as his "disciplinary record and sanctions expunged from [his] record." Id.

Presently before the Court is Defendants' motion to dismiss and for summary judgment. (Doc. 28); Plaintiff's motion for summary judgment, (Doc. 65). The motions have been fully briefed and are ripe for disposition. For the reasons that follow, the Court will grant Defendants' motion to dismiss and for summary judgment and deny Plaintiff's motion for summary judgment.

## II. Standards of Review

### a. Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence

of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with

affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. White, 826 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. Id. (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the

nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. See Sanders v. Beard, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

**b. Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) authorizes the Court to dismiss an action for lack of subject matter jurisdiction. Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction. Gould Elecs., Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). In reviewing a facial challenge under Rule 12(b)(1), the standards associated with Rule 12(b)(6) are applicable. See id. In this regard, the Court must accept all factual allegations in the complaint as true, and the Court may consider only the complaint and documents referenced in or attached to the complaint. In a factual challenge to the Court's subject matter jurisdiction, the Court's analysis is not limited to the

allegations of the complaint, and the presumption of truthfulness does not attach to the allegations. Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions, and testimony, to resolve any factual issues bearing on jurisdiction. Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997).

Once the Court's subject matter jurisdiction over a complaint is challenged, the plaintiff bears the burden of proving that jurisdiction exists. Mortensen, 549 F.2d at 891. If a dispute of material fact exists, "the [C]ourt must conduct a plenary hearing on the contested issues prior to determining jurisdiction." McCann v. Newman Irrevocable Tr., 458 F.3d 281, 290 (3d Cir. 2006); see also Berardi v. Swanson Mem'l Lodge No. 48, 920 F.2d 198, 200 (3d Cir. 1990) (stating that a district court must ensure that a plaintiff has "had an opportunity to present facts by affidavit or by deposition, or in an evidentiary hearing," to support his claim of jurisdiction (citation omitted)).

c. **Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)**.

Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Under Rule 12(b)(6), we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable

reading of the complaint, the plaintiff may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)(quoting Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)). While a complaint need only contain "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), and detailed factual allegations are not required, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Twombly, 550 U.S. at 556). "[L]abels and conclusions" are not enough, Twombly, 550 U.S. at 555, and a court "is not bound to accept as true a legal conclusion couched as a factual allegation." Id. (quoted case omitted). Thus, "a judicial conspiracy claim must include at least a discernible factual basis to survive a Rule 12(b)(6) dismissal." Capogrosso v. The Supreme Court of New Jersey, 588 F.3d 180, 184 (3d Cir. 2009) (*per curiam*).

In resolving the motion to dismiss, we thus "conduct a two-part analysis." Fowler, supra, 578 F.3d at 210. First, we separate the factual elements from the legal elements and disregard the legal conclusions. Id. at 210-11. Second, we "determine whether the facts alleged in the complaint

are sufficient to show that the plaintiff has a "plausible claim for relief"." Id. at 211 (quoted case omitted).

### III. **Statement of Undisputed Facts[4]**

The Psychology Services department at USP-Lewisburg includes treatment specialists and doctoral-level psychologists who are assigned a caseload of inmates, although an inmate may be seen by any psychologist or treatment specialist. (Doc. 37, Statement of Material Facts). Each psychologist at USP-Lewisburg makes rounds on their assigned housing units twice a week. Id.

---

[4] The Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party]...as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. L.R. 56. 1. The Rule further requires the inclusion of references to the parts of the record that support the statements. Id. Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. See id. Unless otherwise noted, the factual background herein is taken from Defendants' Rule 56.1 statement of material facts. (Doc. 38). Plaintiff did not file a response to Defendants' statement of facts in compliance with M.D. Pa. L.R. 56.1 or a statement of material facts to support his own motion for summary judgment. Thus, the Court deems the facts set forth by Defendants to be undisputed. See M.D. Pa. LR 56. 1; Fed. R. Civ. P. 56(e)(2).

When Briggs arrived at the Special Management Unit ("SMU") at USP-Lewisburg on February 26, 2018, Dr. Eigenbrode reviewed his BOP mental health records and the Psychology Services Inmate Questionnaire (PSIQ), which Briggs completed after arriving at the institution. Id. Briggs indicated that he may need psychological services during his SMU placement and reported feeling anxious while in transit to the institution. Id.

Information available from the state where Briggs was incarcerated before entering BOP custody showed no psychosocial history, but while incarcerated in the BOP, Briggs endorsed a history of mental health treatment including being prescribed Ritalin during childhood and a diagnosis of Bipolar Disorder while in state custody. Id.

During intake with the BOP, Briggs reported a history of depression and psychosis, but his most recent Diagnosis & Care Level Formulation, dated August 14, 2017, yielded no diagnosis, and reflected that Briggs had not been prescribed any psychotropic medication during his federal incarceration. Id.

Dr. Eigenbrode noted that Briggs did not display, evidence, or report a need for frequent psychological intervention. Id. Briggs' general stability without medication did not require a psychology or psychiatry specialist for management. Id. Dr. Eigenbrode determined that Briggs was psychiatrically stable and advised him how to access Psychology Services as needed,

noting that Briggs would have the opportunity to speak with Psychology Services during their routine rounds. Id.

A treatment specialist saw Briggs on March 2, 2018 and discussed the requirements for completion of the SMU phases and provided him with the initial Phase I programming material for Psychology Services. Id. The materials regarded an autobiography, thinking errors (identifying and discussing different thinking errors), values for responsible living (developing and identifying one's set of values), and a basic cognitive skills workbook (focuses on developing and understanding and use of rational thinking). Id. Briggs was informed that upon completion of the materials, his work would be reviewed and discussed with him and he would be provided with the remaining Phase I materials. Id.

On March 7, 2018, Dr. Eigenbrode saw Briggs in a holdover cell on his assigned housing unit after Psychology Services received an inmate request to staff (commonly known as a copout) in which Briggs asked to be seen privately "before I do something stupid." Id. Briggs denied experiencing self-harm or suicidal ideation, intent, or plan and stated he was experiencing increased stress because he believed he should not have been sent to the SMU. Id. Dr. Eigenbrode encouraged Briggs to raise issues regarding his SMU placement with his unit team. Id. Briggs expressed interest in self-help

programming in addition to the required programming that had been provided to him shortly after his arrival in the SMU. Id.

Later that day, Dr. Eigenbrode sent Briggs materials titled Motivation for Change – Part 1 and advised him that incentive programs are available through his assigned treatment specialist. Id. On March 20, 2018, Dr. Eigenbrode noted that Briggs had completed the Motivation for Change Materials and was provided Part 2 of the materials. Id.

On March 23, 2018, a treatment specialist saw Briggs during routine rounds, noting that he had successfully completed the initial Phase I materials and he was provided with the remaining Phase I materials. Id. Those materials included workbooks on anger (identifying and responding to anger), living as if (discussing how beliefs impact daily interactions), coping skills (stress reducing skills), and my change plan (promoting prosocial change). Id. Briggs was informed that upon completion, Psychology Services would review the remaining Phase I materials and discuss them with him, at which time Phase I of his Psychology Services programming requirements would be complete. Id.

On April 26, 2018, Dr. McCrea provided feedback to Briggs on the completed materials he had returned to Psychology Services. Id. She arranged to provide Briggs with the Distress Tolerance modules in response to Briggs' request for additional materials. Id.

- 11 -

A treatment specialist noted that Briggs had completed the Phase I program materials for the SMU on April 27, 2018. Id. She offered Briggs an opportunity to participate in incentive programming before his placement into Phase II of the SMU program where Psychology Services provides out of cell group treatment. Id.

On May 8, 2018, Briggs reported that he was "stressing" and did not want to speak at the door, so Dr. McCrea saw him in a private holdover cell on his assigned housing unit. Id. Briggs reported frustration with being wrongly placed in the SMU and asked to be moved to a different housing unit. Id. However, he reported no issues with his cellmate, stated he was doing well with SMU programming materials and returned the completed first module of the Distress Tolerance materials. Id. Dr. McCrea advised Briggs to discuss his request to be moved to a different housing unit with a lieutenant and provided Briggs additional Distress Tolerance modules on May 24, 2018. Id.

During routine rounds on June 1, 2018, Briggs submitted a copout requesting to be placed into Dr. Enigk's "class" and asked to be seen privately. Id. Dr. Enigk requested more specific information about the issues Briggs was having so she could determine the appropriate interventions and advised Briggs in the meantime to practice the coping skills outlined in the SMU program materials on a daily basis. Id. Dr. Enigk also informed Briggs

that she was not then running any classes in the SMU, but that his treatment specialist could assist him with any programming materials he wished to complete. Id.

On June 11, 2018, Dr. Enigk noted that inmate Briggs had returned Modules 2 and 3 of the Distress Tolerance protocol, which she reviewed his work and returned it to him with feedback and Module 4 of the protocol. Id.

On June 22, 2018, Briggs submitted a copout to Psychology Services stating he was trying to prevent himself from doing something he would regret later. Id. However, the copout had been written two days before Briggs submitted it to Psychology Services. Id. Dr. Brockman consulted with unit staff and noted no significant changes in Briggs mood or behavior during the two previous days. Id. Briggs denied having suicidal ideation, plan, intent, or self-directed violence and claimed the reason for his copout was to express his level of frustration and a desire to complete continued programming. Id.

On June 25, 2018 Dr. Enigk noted that Briggs had submitted Module 4 of the Distress Tolerance protocol, which she reviewed and sent it back to Briggs with feedback, indicating that he had completed the protocol at that time. Id.

Dr. Enigk issued Briggs a disciplinary incident report on July 28, 2018 because he submitted a copout addressed to a psychologist with personal content and which contained a covert sexual proposal. Id. That same day,

Briggs submitted a copout to Psychology Services complaining that his mental health needs were not being met and asking for additional programming. Id. Dialectical Behavior Therapy (DBT) distress tolerance worksheets were sent to him. Id.

On July 6, 2018, Dr. Brockman provided Briggs with the Crisis Survival Skills handouts from Module 4 of the DBT Skills Training module. Id.

On July 17, 2018, Dr. Enigk sent Briggs a response to two copouts submitted to Psychology and his Unit Manager stating he did not feel his treatment needs were being met and he was suffering from "bi-pola[r], depression, ADHD, paranoia, etc" and required medication. Id. Dr. Enigk advised Briggs that at that time, he did not meet the criteria for any major mood or psychotic disorder, thus medication and individual treatment services were not warranted. Id. She explained the importance of practicing the skills in the materials previously provided to him as well as those in the SMU program materials, as those skills are specifically aimed at helping inmates learn to manage all manner of stressors and avoid acting-out behaviors. Id. Dr. Enigk also advised Briggs to discuss any additional concerns with a psychologist or treatment specialist during routine rounds so additional interventions which might be helpful could be determined. Id.

After Briggs completed and returned the Crisis Survival Skills worksheets, Dr. Enigk reviewed them and returned them to him with

feedback on July 23, 2018. Id. On August 8, 2018, Dr. Brockman sent Briggs the Reality Acceptance Skills handouts. Id.

Briggs expressed gratitude for the assignments he received when Dr. Brockman next saw him during routine rounds on August 15, 2018. Id. Dr. Brockman informed Briggs that additional material would be sent once he completed the initial set. Id. However, on August 15, 2018, Dr. Brockman issued Briggs an incident report because, after her contact with him that day, the doctor observed him standing in the back of his cell engaging in sexually inappropriate behavior as she spoke with his cellmate. Id.

Dr. Eigenbrode performed a Suicide Risk Assessment on August 15, 2018 after staff reported that Briggs attempted to hang himself. Id. He had improvised a noose loosely around his neck while his cellmate was observed holding him up and Briggs appeared to be using his arms to keep himself elevated. Id. This incident occurred after Dr. Brockman issued him an incident report that same day. Id. Although Briggs acknowledged Dr. Eigenbrode by making eye contact, he would not respond to her inquiries. Id. Staff reported that Briggs had been verbally communicating with him before Dr. Eigenbrode's arrival. Id. When Dr. Brockman saw Briggs earlier that day, he evidenced no signs of distress or agitation and made no indication of suicidality. Id. Collateral data suggested that Briggs' August 15, 2018 suicide event was aimed at garnering the immediate attention of

Psychology staff in response to having been issued the incident report. Id. However, Dr. Eigenbrode implemented suicide watch protocol until the next day, when Briggs actively participated in an interview and denied suicidality. Id. During the interview on August 16, 2018, Briggs was future and goal-oriented, elaborated on his need for treatment and psychotropic medication. Id. Dr. Ramirez, who is not a party to this lawsuit, conducted a Suicide Risk Assessment three days later. Id.

On October 18, 2018, Briggs had tied a noose around his neck in front of the housing unit during routine rounds but complied with the request of the housing unit officer to remove the noose from his neck. Id. Staff placed Briggs in a private area and observed him until Dr. Ramirez arrived. Id. Briggs did not express suicidal ideation, intent, means or plans. Id. Dr. Ramirez spent time educating Briggs about coping techniques he could use in his cell to deal with his thoughts in a healthy manner. Id. Briggs agreed to practice the skills over the next few days. Id. Dr. Ramirez determined that Briggs was at a low risk for suicide that day and concluded that a suicide watch was not warranted. Id.

On August 22, 2018, Dr. McCrea, who is not a defendant in this lawsuit, performed a Suicide Risk Assessment after staff observed Briggs with a bed sheet wrapped around his neck and the other end of the sheet tied to the back of his cell. Id. Briggs complied with staff orders to remove the sheet and

submitted to hand restraints. Id. He was removed from his cell and placed in a private holdover cell under staff observation until Dr. McCrea's arrival. Id.

During the Suicide Risk Assessment on August 22, 2018, Briggs reported that he had "been having really bad thoughts" and needed to "stay busy at all times". Id. Dr. McCrea reminded Briggs that he has been provided with numerous materials and coping skills which require continued practice and utilization. Id. When asked what skills or materials he found helpful; Briggs stated his previous use of medications "helped big time". Id.

Dr. McCrea advised Briggs to contact Health Services with questions about medications and he agreed to receive materials on mindfulness and grounding which were discussed at length with him during the assessment. Id. Dr. McCrea concluded inmate Briggs was at low risk for suicide and a suicide watch was not warranted at that time. Id.

On September 7, 2018, Dr. Brockman responded to a copout in which Briggs requested to speak with specific psychologists and attached a packet on grounding and a copy of a Rhode Island Department of Corrections note which noted Briggs was "faithfully taking his medication[,]" but contained no specific information about the medication being taken. Id. Dr. Brockman noted that Briggs was continuing to request placement on medication but was unable to provide details in relations to the symptomatology he was

experiencing; the packet was returned to inmate Briggs because it provided guidance on grounding. Id.

Three days later, on September 10, 2018, Dr. Brockman performed a Suicide Risk Assessment after the Operations Lieutenant received a copout from Briggs requesting to speak with a specific psychologist and indicating he would do "something" stupid if he was not seen. Id. Dr. Brockman noted that Briggs refused to speak to her during the Suicide Risk Assessment but spoke with other staff in a future-oriented manner. Id. Although Briggs did not make statements specific to suicidal ideation, plan, intent, or related behaviors, Dr. Brockman placed him on suicide watch by non-clinical staff out of an abundance of caution until he could be assessed. Id.

Dr. Brockman noted that there had been an increase in Suicide Risk Assessments with Briggs since he had received an incident report to engaging in a sexual act and it was possible, he was attempting to make himself appear to be mentally ill. Id. Dr. Brockman reminded Briggs that diagnoses wax and wane over a lifetime, and he did not have any current symptoms consistent with a diagnosis. Id. Dr. Brockman determined Briggs was at low risk for suicide and removed him from the suicide watch which had been initiated by non-clinical staff because it was no longer warranted. Id.

The next day, on September 11, 2018, Dr. Brockman performed another Suicide Risk Assessment after Briggs tied a noose around his neck and was observed holding himself up with his arms. Id. Non-clinical staff placed Briggs on suicide watch until he could be assessed by Dr. Brockman. Id. Dr. Brockman interviewed staff who indicated the noose was placed around Briggs' neck in a position in which it did not apply pressure and additionally, Briggs' cellmate was holding his feet up off the ground. Id. Briggs complied with staff orders to remove the noose from his neck. Id. Dr. Brockman attempted a clinical interview with Briggs, but he refused to interact with her or the other available psychologist. Id.

Dr. Brockman again noted that Briggs' behavior altered after he received an incident report for engaging in sexual acts, that he had responded inappropriately to in-cell treatment assignments by focusing on his desire to receive medication and a perceived lack of treatment by Psychology Services, and that Briggs had also submitted several copouts in relation to his self-identified treatment needs. Id. Although Briggs refused to speak with Dr. Brockman, he was speaking with other staff in a future-oriented manner, he maintained an interest in gaining access to his state records, requested to speak with specific psychologists, and had been completing frequent copouts focused on receiving medication and diagnoses. Id. Dr. Brockman concluded Briggs was a low risk for suicide and

was removed him from the suicide watch that was initiated by non-clinical staff because it was no longer warranted.

Later on September 11, 2018, Dr. Brockman instituted a Suicide Risk Management Plan (SRMP) for Briggs, noting that he had undergone five suicide risk assessments and three placements on suicide watch (two by non-clinical staff) within the last month. Id. The doctor noted that despite attempts to engage Briggs in treatment activities, he had been unwilling to participate in meaningful, active, and collaborative treatment and it appeared the increased, crisis-driven contacts were reinforcing Briggs' maladaptive patterns of thought and behavior. Id. The goal of the SRMP was to attempt to shape Briggs' environment in ways which would discourage self-harm and encourage healthy replacement behaviors. Id.

Dr. Eigenbrode saw Briggs on September 13, 2018 in accordance with his SRMP. Id. Briggs acknowledged the doctor with brief eye contact but refused to speak with her. Id. Dr. Eigenbrode reminded Briggs of the SRMP, of his treatment goals and terminated the encounter. Id.

Dr. Brockman saw Briggs pursuant to his SRMP on September 13, 2018. Id. Briggs expressed regret for his prior actions and demonstrated an increased level of motivation including expressing interest in treatment material. Id. Therefore, Dr. Brockman removed Briggs from the SRMP

because Briggs had not engaged in the identified target behaviors and expressed interest in and motivation for treatment. Id.

On December 4, 2018, Dr. Brockman completed a Diagnostic and Care Level Formulation after Briggs received records, he requested from the Rhode Island Department of Corrections. Id. A review of those records revealed former diagnoses of Mood Disorder, Unspecified; Bipolar, Unspecified; Adjustment Disorder with Disturbance of Emotions and Conduct; and Anxiety Generalized, with treatment consisting primarily of the use of psychotropic medication, clinical contacts and individual therapy in which inmate Briggs discussed his grievances. Id. Dr. Brockman noted that the records from the Rhode Island Department of Corrections revealed that while on medication, Briggs would note side effects or indicate he was no longer going to take the medication if he did not receive what he was seeking (i.e., information regarding a transfer). Id. However, the records contained no indication that evidence-based treatment protocols were implemented. Id. Their records referenced ruling out a diagnosis of psychosis after auditory hallucination, but after additional follow-up, it was determined that the auditory hallucinations occurred when Briggs was under the influence of the drug, Ecstasy. Id.

While in state custody, Briggs received a diagnosis of bipolar, NOS in April 2011 after a masters-level clinician noted Briggs "appears to be doing

well. Possibly too well, his mood appears elevated, hypomanic." Id. Dr. Brockman noted that the records also revealed no additional information describing symptomatology and documentation in July 2011 identified Briggs as experiencing "irritable mood" and "expansive affect" with "loud speech" noting "[he] does not appear manic or psychotic at this time." Id.

Dr. Brockman also noted on December 4, 2018, that Briggs' federal records reveal he experienced difficulty overcoming increased stress during periods of change; that Briggs was not currently presenting with symptoms of hypomania, mania, depression or anxiety; and was using his former diagnosis of Bipolar Disorder as a means to describe his frustration and anger. Id. Since transferring to the BOP in 2012, Briggs had not presented with symptoms consistent with a mood, anxiety or thought disorder. Id. Thus, on December 4, 2018, Dr. Brockman diagnosed Briggs with Other Specified Personality Disorder with Antisocial Traits with personality characteristics of: failure to conform to social norms with respect to lawful behaviors; deceitfulness; irritability; and reckless disregard for safety of others. Id.

During routine rounds on December 12, 2018, Briggs returned programming materials to Dr. Brockman and requested to be seen but did not provide a reason or identify symptoms consistent with a mental illness. Id. Dr. Brockman advised Briggs that his assigned treatment specialist would follow up. Id.

- 22 -

Dr. Brockman performed a Suicide Risk Assessment on Briggs on December 14, 2018 after he made a statement suggestive of suicidal ideation (e.g., "you won't know if I kill myself"). Id. The doctor noted that Briggs refused to speak with Psychology Services earlier that day, and during her clinical interview, Briggs denied suicidal ideation, plan, and intent. Id. Briggs asked if additional material could be provided to keep him "busy". Id. Dr. Brockman concluded that no suicide watch was necessary because Briggs was at low risk for suicide. Id.

On January 7, 2019, Dr. Enigk briefly saw Briggs due to his continued requests for medication to treat Bipolar Disorder. Id. She noted that since entering BOP custody in February 2012, Briggs did not evidence or report signs of a major mood or psychotic disorder and only sought help from Psychology for problems dealing with anger and frustration. Id. She noted that Briggs' perception that he had a serious mental illness and needed medication had persisted for several months and presented Briggs with the option of participating in formal psychological testing to determine whether symptoms were present that he was having difficulty articulating or if there was any presence of mental illness beyond character pathology. Id. Briggs was agreeable to the testing and requested materials to keep himself productively occupied. Id.

Dr. Enigk completed a Mental Health Evaluation of Briggs on January 15, 2019, which consisted of notification of a clinical interview, Central File review, review of BOP medical and psychology records, collateral information and observations by staff, and psychological testing via the Personality Assessment Inventory (PAI) Id. The profile resulting from the PAI was deemed invalid and uninterpretable due to high elevations on the infrequency (INF), inconsistency (INC), and negative impression (NIM) scales, indicating that Briggs endorsed a number of items that are not frequently endorsed even by individuals with severe mental illness in hospital settings, that he was not consistent in his endorsement of symptoms, and that he may have been attempting to malinger serious mental illness. Id. Based on the totality of information gleaned from the Briggs' evaluation, Dr. Enigk maintained the diagnosis set forth in Briggs' Diagnostic and Care Level Formulation of December 4, 2018: Other Specified Personality Disorder with Antisocial Traits. Id.

On January 17, 2019, Dr. Enigk received a copout from Briggs in which he appeared to preemptively reject the results of his recent mental health evaluation although he had not yet received the results; Briggs requested to speak to Dr. Enigk privately and made vague threats to continue filing grievances against Psychology. Id. The doctor concluded that the copout

and its contents supported the results of the mental health evaluation and his diagnosis of Other Specified Personality Disorder. Id.

On January 22, 2019, Dr. Enigk met with Briggs along with USP Lewisburg's Clinical Director to discuss the results of his January 15, 2019 Mental Health Evaluation. Id. They talked at length with Briggs about the nature of Bipolar Disorder and how his presentation and reported symptoms differ from that diagnosis. Id.

Dr. Enigk noted that during the January 15, 2019 clinical contact, Briggs asked appropriate questions about whether his past diagnosis may have been inaccurate and what the effects of taking mood stabilizing medication might be for someone who does not need it. Id. On January 15, 2019, Dr. Enigk addressed all of Briggs questions, discussed his diagnosis and how personality disorders develop, and talked with Briggs about the importance of using skills included in programming assignments daily to address stressors. Id. She talked with him about changing the way he thinks about stress and anger-inducing situations, encouraged him to take time to process what they discussed and to talk with Psychology Services during rounds about additional questions and next steps. Id.

Dr. Brockman saw Briggs during routine rounds on January 28, 2019, when he identified feeling "confused" following his contact with Dr. Enigk and the Clinical Director, stating, "I thought the test could not be manipulated but

they say I manipulated the test." Id. She advised Briggs of the validity scales on the test and informed him that due to his responses, his test was identified as invalid and agreed to provide him a copy of the test report. Id. Dr. Brockman reminded Briggs that Psychology Services programming material is not designed to be completed quickly, but rather to be completed and practiced. Id.

During an evaluation by Dr. Eigenbrode on February 11, 2019 in accordance with hunger strike protocol, Briggs complained that he needed psychotropic medication, but when asked about his symptoms, Briggs vaguely asserted that he does not manage well. Id. However, Briggs remained consistently future-oriented and did not endorse any indicator suggestive of self-harm/suicidal ideation, intent, or plan and stated that his disruptive behavior was related to his belief that he needs to be assessed by telepsychiatry and ultimately prescribed psychotropic medication. Id.

On February 19, 2019, Dr. Eigenbrode saw Briggs and terminated a contact during routine rounds because, although Briggs acknowledged her via eye contact and maintained a constant gaze throughout the contact, he refused to respond to her inquiries, including his request for a copy of his recent mental health evaluation. Id. However, a few minutes later, Dr. Eigenbrode overheard Briggs yelling for the officer in charge of the housing unit to advise her that he needed to speak with Psychology. Id.

On February 20, 2019, Dr. Brockman provided Briggs with a copy of the January 15, 2019 psychological evaluation and Dr. Eigenbrode spoke with Briggs about completion of programs. Id. Dr. Eigenbrode advised Briggs she would review his records and offer him additional programming, but noted that although Briggs had participated in several self-help programs aimed at improving his distress tolerance and coping skills, he would either complete the assignments quickly and request additional programming or complain that he was not being provided with proper treatment. Id. Dr. Eigenbrode noted that due to Briggs' ongoing complaints regarding mental health treatment and behavior problems it appeared unlikely he was routinely practicing the skills offered to him and/or had limited interest in non-medicinal coping skills. Id. She therefore recommended that he complete the required SMU programming and be advised of potentially beneficial self-help programming during future rounds. Id.

Dr. Eigenbrode saw Briggs again on February 27, 2019, noting that he was agreeable to participating in Motivation for Change, which he had previously started, but not finished. Id. Later that day, she sent Briggs Part 1 of the Motivation for Change workbook series, which consists of three parts to explore the concept of change, provide exercises to help review life choices, identify goals for a more positive future, and evaluate confidence in one's ability to make positive life changes. Id. Briggs completed Motivation

for Change, Part 1, on March 4, 2019. Id. Dr. Eigenbrode reviewed the materials, provided feedback, and gave Briggs Part 2 of the series. Id.

However, on March 8, 2019, Dr. Eigenbrode responded to two copouts in which Briggs complained about other psychologists. Id. Briggs stated that he believed his records and test results were fabricated, described feeling chronically angry and rageful, and requested to be evaluated by a psychiatrist. Id. Dr. Eigenbrode advised Briggs that he did not present with symptoms indicative of a major mental illness to include Bipolar Disorder and reminded him that Health Services (not Psychology Services) addresses medication requests. Id. She informed Briggs that he did not have a diagnosis or present with symptoms suggesting a referral to Health Services or that telepsychiatry was warranted and urged him to increase the effectiveness of his coping skills by proactively practicing them on a daily basis for an enduring period of time. Id. Dr. Eigenbrode also provided Briggs with feedback on Part 2 of the Motivation for Change series workbook. Id.

On March 20, 2019, Briggs submitted a copout to Dr. Brockman during routine rounds in which he expressed distrust of Psychology Services and noting that he felt as if information was not included in the January 15, 2019 Mental Health Evaluation. Id. Dr. Brockman clarified with Briggs that his state records were reviewed and documented, and despite Briggs' interest in receiving a second opinion and to be seen by a psychiatrist, Briggs did not

present with symptoms consistent with a mood, anxiety, or thought disorder and his behavior was better accounted for through his diagnosis of Other Specified Personality Disorder with Antisocial Traits. Id. Briggs became increasingly agitated, threw his test results on the ground, and began kicking his cell door. Id.

On April 8, 2019, Dr. Enigk reviewed records submitted to her by Briggs of an evaluation of him conducted at Bradley Hospital in 2001. Id. The records indicated that while attending a training school substance abuse program at the age of seventeen, Briggs was referred to the hospital on February 7, 2001 for an evaluation after voicing homicidal ideation. Id. The Bradley Hospital evaluation resulted in an order for medication as needed to calm Briggs' agitation, a recommendation that Briggs be assessed for antidepressant medication, a diagnosis of Post-Traumatic Stress Disorder ("PTSD") related to his childhood abuse history, and Polysubstance Abuse in remission. Id. Dr. Enigk noted the evaluating psychiatrist at Bradley Hospital made recommendations for individual, group, and family therapy as well as 24-hour supervision while at the training school. Id.

Dr. Enigk also noted on April 8, 2019, that during his time in BOP custody, Briggs has not presented with symptoms indicative of PTSD or any other mood or psychotic disorder, but Briggs has consistently sought assistance from Psychology Services for problems managing anger. Id.

Despite the age of the records from Bradley Hospital, Dr. Enigk concluded that records indicated a long-standing history of antisocial behavior that has been an area of clinical concern and supports the diagnosis of Other Specified Personality Disorder with Antisocial Traits and thus made no changes to Briggs' diagnosis. Id.

On May 15, 2019, Dr. Eigenbrode responded to a copout dated May 14, 2019, in which Briggs referenced a long-term problem of having "bad violent thoughts" and claimed his requests for assistance "keep getting denied", further stating he has "too much anger/aggression built up inside me that it gives me headaches" and "[I] grind my teeth till my gums bleed". Id. The doctor noted that Briggs made no report of such a problem when she saw him just two days prior, referenced the copious materials provided to him concerning anger management and provided him an anger management workbook with her response. Id. Dr. Eigenbrode reminded Briggs that he must routinely practice adaptive skills to manage his anger in order to increase their effectiveness. Id. She encouraged him to submit a copout or speak with Psychology Services staff during rounds if he was interested in participating in an anger management program available through his housing unit's assigned treatment specialist. Id.

## IV. Discussion

Defendants argue that they are entitled to judgment in their favor on the following grounds: (1) Briggs' official-capacity claims are barred by sovereign immunity; (2) Briggs fails to satisfy the physical injury requirement of 28 U.S.C. §1346(b)(2) and 42 U.S.C. §1997e(e); (3) Briggs' fails to state an Eighth Amendment Constitutional claim; (4) Briggs' requires a psychological expert to establish his FTCA claim and his Certificate of Merit (COM) does not satisfy the requirements of Pa. R. Civ. P. 1042.3; and (5) Defendant Enigk is entitled to statutory immunity as an officer in the Public Health Service.

### A. Federal Tort Claims Act

#### 1. Administrative Tort Claim Number TRT-NER-2019-01354

A prerequisite to suit under the FTCA is that a claim must first be presented to the Federal agency and be denied by that agency. Specifically, the FTCA provides:

> An action shall not be instituted against the United States for money damages for injury or loss of property or personal injury ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. §2675(a). "The statutory language is clear that a court does not have jurisdiction before administrative remedies have been exhausted, and

a court must dismiss any action that is initiated prematurely." Wilder v. Luzinski, 123 F. Supp. 2d 312, 313 (E.D. Pa. 2000) (citing McNeil v. United States, 508 U.S. 106 (1993)).

Thus, prior to commencing an FTCA action against the United States in federal court, a plaintiff must "first present [ ] the claim to the appropriate [f]ederal agency" and receive a final denial "by the agency in writing and sent by certified or registered mail." 28 U.S.C. §2675(a). A claim is considered to be presented when the federal agency receives written notification of the alleged tortious incident and the alleged injuries, together with a claim for money damages in a sum certain, in the form prescribed by the applicable federal regulations. 28 C.F.R. §14.2(a). If the receiving federal agency fails to make a final disposition of the claim within six months from the time it is filed, that failure is "deemed a final denial of the claim" for purposes of commencing suit under the FTCA. 28 U.S.C. §2675(a).

On November 14, 2018, Plaintiff filed Administrative Tort Number TRT-NER-2019-01354, with the BOP Northeast Regional Office requesting a sum certain of five-hundred thousand ($500,000.00) alleging he was being denied medication for a mood disorder. (Briggs v. U.S., Civil No. 3:19-cv-1499 at Doc. 41-1).

On May 13, 2019, the Regional Office denied Briggs' claim, finding no evidence he experienced a compensable loss, and noted that evaluations

revealed he had not reported or exhibited symptoms consistent with the need for psychotropic medication. Id. Plaintiff was informed he had six months from the May 13, 2019, denial to file suit in federal district court. Id. Plaintiff timely filed Briggs v. U.S., Civil No. 3:19-cv-1499, on August 29, 2019.

## 2. **Certificate of Merit**

Briggs asserts that Defendants were negligent in denying him access to a psychiatrist and medication for bipolar disorder. (Doc. 1). The United States argues that Briggs' FTCA claim must be dismissed because he failed to file a certificate of merit.

Pennsylvania Rule of Civil Procedure 1042.3 requires that a plaintiff file a certificate of merit ("COM") from a medical expert with respect to a professional negligence claim against the United States. Rule 1042.3 provides as follows:

(a) In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party that either

(1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or

(2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or

(3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

PA. R. CIV. P. 1042.3(a).

If a plaintiff fails to file the required certificate within sixty (60) days of filing the complaint, the proper procedure in federal practice is to file a motion pursuant to Federal Rule of Civil 12(b)(6) to dismiss the professional negligence claim without prejudice. Stroud v. Abington Mem'l Hosp., 546 F.Supp.2d 236, 250 (E.D. Pa. 2008). "[T]he sixty-day deadline for filing a COM will be strictly construed and not lightly excused." Id. The rule applies to *pro se* as well as represented plaintiffs and constitutes a rule of substantive state law with which plaintiffs in federal court must comply. See Iwanejko v. Cohen & Grigsby, P.C., 249 Fed.Appx. 938, 944 (3d Cir. 2007); Maruca v. Hynick, 2007 WL 675038, at *3 (M.D. Pa. 2007) ("[T]he language of Rule 1042.3(a) – i.e., 'or the plaintiff if not represented ... shall file ... a certificate of merit' expressly requires that a *pro se* plaintiff must file a certificate of merit,").

Failure to file a certificate of merit under Rule 1042.3(a), or a motion for extension under Rule 1042.3(d), is fatal unless the plaintiff demonstrates that his failure to comply is justified by a "reasonable excuse." Perez v.

Griffin, 304 Fed.Appx. 72 (3d Cir. 2008) (per curiam) (nonprecedential); <u>see</u> <u>also</u> Womer v. Hilliker, 908 A.2d 269, 279-80 (Pa. 2006) (holding that a court may reconsider judgment entered for failure to comply with Rule 1042.3 if the plaintiff demonstrates a "reasonable excuse" for the noncompliance); PA. R. CIV. P. 1042.6 (authorizing entry of *non pros* judgment if a malpractice plaintiff fails to comply with Rule 1042.3).

In the instant case, Briggs was required to file a COM producing expert testimony that the requested psychiatric care and psychotropic medication was medically necessary. Briggs filed his complaint on August 29, 2019. Thus, he was required to file a COM on or before October 28, 2019.

By Order dated January 22, 2020, this Court, without addressing its content, granted Plaintiff's November 29, 2019 motion to present his Certificate of Merit, and deemed it timely filed. (Doc. 31).

Defendants now move to dismiss Plaintiff's Certificate of Merit as it fails to substantially comply with the requirements of Rule 1042.3. The Court agrees.

Plaintiff's November 29, 2019 purported Certificate of Merit is a seventy-three-page document, which consists of six pages of argument and sixty-seven pages of medical record exhibits. (Doc. 22). While Briggs acknowledges that a COM is required when a complaint "involves diagnosis, care and treatment by licensed professionals," <u>Id</u>, his COM merely contains

alleged facts, as supported by attached records, which pertain to treatment he received for a diagnosis of bipolar disorder in 2011 and 2012, the psychological treatment he received at USP-Lewisburg, responses to the grievances he submitted to complain about his psychological treatment at USP-Lewisburg, and his stated belief that psychology staff violated BOP policy. Id. Briggs disputes his psychological diagnosis at USP-Lewisburg, whether psychiatrist is required to treat him as opposed to a psychologist, and whether he requires psychotropic medications. Id.

To the extent that Briggs suggests that his medical claims are of ordinary negligence, rather than professional negligence, i.e., that even a lay person would have recognized the need for him to have been seen by a psychiatrist and prescribed psychotropic medication fails. In Grundowski v. United States, 2012 WL 1721781 (M.D. Pa. 2012), the Court set forth the proper inquiry courts should make when determining whether a claim is one of ordinary negligence, rather than medical malpractice, as follows:

> In conducting this inquiry, "a court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience."…. When evidence is predicated "upon facts constituting medical treatment … involv[ing] diagnosis, care, and treatment by licensed professionals," the evidence "must be characterized as [evidence of] professional negligence."… As noted by the Third Circuit, "a complaint 'sounds

in malpractice' where 'the conduct at issue constituted an integral part of the process of rendering medical treatment.' "

Id. at *6 (citations omitted). Applying this inquiry to the instant case, Briggs' claim is that Defendants prevented him from receiving psychiatric treatment and psychotropic medication for his alleged mental issues. These claims involve decisions regarding the rendering of medical treatment, which involves professional medical judgment beyond the realm of the lay person. It cannot be said that a decision of whether, when or what type of medical treatment should be provided "is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons." Hightower-Warren v. Silk, 698 A.2d 52, 54 n.1 (Pa. 1997). Accordingly, a certificate of merit is required for this professional negligence FTCA claim. See Paige v. Holtzapple, 2009 WL 2588849, at *10-11 (M.D. Pa. 2009) ("Where the conduct at issue constituted an integral part of rendering medical treatment, and involved diagnosis, care, and treatment by a licensed professional, ... the action is one that is characterized as a professional negligence action requiring expert testimony."). Consequently, Briggs' FTCA claim against the United States will be dismissed for failure to file a COM that substantially complies with the requirements of Pa.R.Civ.P. 1042.3.

## B. The Bivens Action

Plaintiff's constitutional claims are filed pursuant to 28 U.S.C. §1331, in accordance with Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388. (1971). Under Bivens, the District Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 to entertain an action brought to redress alleged federal constitutional or statutory violations by a federal actor. Bivens, supra. Pursuant to Bivens, "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978). A Bivens-style civil rights claim is the federal equivalent of an action brought pursuant to 42 U.S.C. §1983 and the same legal principles have been held to apply. See Paton v. LaPrade, 524 F.2d 862, 871 (3d Cir. 1975); Veteto v. Miller, 829 F.Supp. 1486, 1492 (M.D. Pa. 1992); Young v. Keohane, 809 F.Supp. 1185, 1200 n. 16 (M.D. Pa. 1992). In order to state an actionable Bivens claim, a plaintiff must allege that a person has deprived him of a federal right, and that the person who caused the deprivation acted under color of federal law. See West v. Atkins, 487 U.S. 42, 48 (1988); Young v. Keohane, 809 F.Supp. 1185, 1199 (M.D. Pa. 1992).

### 1. **Defendant Enigk entitled to Statutory Immunity**

The Public Health Service Act, 42 U.S.C. §233(a), provides that an action against the United States under the FTCA is the exclusive remedy "for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment." 42 U.S.C. §233(a). As such, the Public Health Service Act grants absolute immunity to Public Health Service officers from Bivens actions "arising out of the performance of medical or related functions within the scope of their employment." Hui v. Castaneda, 559 U.S. 799, 806 (2010); see also Etkins v. Glenn, 519 F. App'x 111 (3d Cir. 2013) (nonprecedential) (affirming district court's denial of a motion to add Public Health Service employee as additional defendant because she is entitled to absolute immunity from Bivens claims).

Briggs asserts that Defendant Enigk violated his constitutional rights under the Eighth Amendment when she ignored his requests for psychiatric treatment and psychotropic medication. However, it is undisputed that Defendant Enigk is a commissioned officer with the Public Health Service, (see Doc. 37-1 at 3) and was acting within the scope of her official duties when she was dealing with Briggs. Thus, Briggs cannot maintain a Bivens

action against Defendant Jennifer Enigk, a Public Health Service employee, for harm arising out of alleged constitutional violations committed while acting within the scope of her employment. Accordingly, Defendant Enigk is entitled to judgment in her favor as to Biggs' Bivens claim against her.

### 2. Official Capacity Claims

Defendants argue that any claims seeking monetary damages against them in their official capacities are barred by the Eleventh Amendment. Claims against individual defendant in their official capacity are barred by the doctrine of sovereign immunity. See Chinchello v. Fenton, 805 F.2d 126, 130 n.4 (3d Cir. 1986) ("The district court properly ruled that sovereign immunity barred Chinchello's claim against Scott in his official capacity . . . "); Perez-Barron v. United States, 480 Fed. Appx. 688, 691 (3d Cir. 2012) (stating, "The United States, FBOP, and the individual FBOP employees in their official capacity, however, are barred from suit by the doctrine of sovereign immunity.") (citing FDIC v. Meyer, 510 U.S. 471, 486 (1994); Chinchello, 805 F.2d at 130 n.4)). Hence, Biggs' claims for money damages against the Defendants in their official capacities are barred by sovereign immunity, and summary judgment will be granted in favor of Defendants on this ground.

### 3. Eighth Amendment Medical Claim

In order to establish an Eighth Amendment medical claim, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions by prison

- 40 -

officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003). See also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would recognize the need for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." Id.

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment ..." Estelle v. Gamble, 429 U.S. 97, 106 (1976). For instance, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." Id., 429 U.S. at 107. "[A]s

long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). Further, a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment. See White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or medical malpractice does not give rise to a §1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

Further, a prison administrator cannot be found deliberately indifferent under the Eighth Amendment because he or she fails to respond to the medical complaints of an inmate being treated by a prison physician, or because, as non-physicians, they defer to the medical judgment of the inmate's treating physicians. Id., 991 F.2d at 69. If, however, non-medical prison personnel had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," liability may be imposed. Spruill, 372 F.3d 236.

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. Farmer v.

Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988). See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976).

Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996). The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer v. Carlson, 685 F. Supp. at 1339.

Assuming, without deciding, that Plaintiff's medical needs were serious in the constitutional sense, the record evidence more than amply demonstrates that Plaintiff received medical attention, and that the attention Plaintiff received lacks the requisite deliberate indifference to support a Section 1983 claim. Plaintiff, himself, admits that he has been provided medical treatment.

At best, Plaintiff's complaint demonstrates his disagreement with the type of treatment rendered, specifically, his disagreement with psychology and medical professionals at USP-Lewisburg with respect to his need for psychiatric care and medications. Though he may have disagreed with the Psychology Department's assessment that psychiatric care and

psychotropic medication was not medically necessary, his disagreement with the course of action that was taken is not enough to state a §1983 claim. Sample v. Diecks, 885 F.2d 1099, 1109 (3d Cir. 1989) (citing Estelle, 429 U.S. at 105-06 (in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind)). This is particularly so in light of the fact that there are no allegations in the complaint that any of the Defendants intentionally withheld medical treatment from Plaintiff in order to inflict pain or harm upon Plaintiff. Farmer; Rouse. To that extent, the record demonstrates that Plaintiff has been psychologically assessed on numerous occasions by several different treating psychologists, shows that Defendants continue to be attentive to Plaintiff's situation.

Thus, the Plaintiff's complaint amounts to nothing more than Plaintiff's subjective disagreement with the treatment decisions and medical judgment of the Psychology Department at the prison. Where, as here, an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. Nottingham v. Peoria, 709 F. Supp. 542, 547 (M.D. Pa. 1988). Defendants' motion for summary judgment will be granted.

**4. No physical injury as required by 28 U.S. §1346(b)(2) and 42 U.S.C. §1997e.**

Congress has adopted a number of requirements and exceptions to the FTCA's waiver of sovereign immunity. CNA v. U.S., 535 F.3d 132, 138 (3d Cir. 2008). The United States is not liable under the FTCA for money damages for suits arising out of constitutional violations. Smith v. U.S., No. 12–1800, 2012 WL 3245347, *2 (3d Cir. Aug.10, 2012) (citing Couden v. Duffy, 446 F.3d 483, 499 (3d Cir. 2006)). Likewise, 28 U.S.C. §1346(b)(2), provides that:

> No person convicted of a felony ... while serving a sentence may bring a civil action against the United States ... for mental or emotional injury suffered while in custody without a prior showing of physical injury.

> 28 U.S.C. §1346(b)(2).

Similarly worded, and equally applicable to Briggs' claim, is the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997, which also restricts a prisoner's ability to recover compensatory damages for solely mental and emotional injuries. "No Federal civil action may be brought by a prisoner ... for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. §1997e(e). The Third Circuit Court of Appeals in Mitchell v. Horn, 318 F.3d 523, 533 (3d Cir. 2003), held that in order to satisfy §1997e(e)'s physical injury requirement, a plaintiff must

demonstrate a less than significant, but more than *de minimis* physical injury. Id. at 536. The physical injury requirement in 28 U.S.C. §1346(b)(2) is similar to that of 42 U.S.C. §1997e(e). See Michtavi v. United States, No. 4:07–CV–0628, 2009 WL 578535, *5 n. 2 (M.D.Pa. Mar.4, 2009) ("Given the similarities between §1346(b)(2) and §1997e(e), and given that the PLRA also applies to Michtavi's claims, the Court will rely upon cases interpreting either statute.") (citing Perez v. United States, 271 F. App'x 240, 242 (3d Cir. 2008)). Thus, both the FTCA and the PLRA preclude a convicted felon's action for mental and emotional injuries without a showing of a prior physical injury.

Outside of Plaintiff's allegation in his complaint that he lost weight during a hunger strike in an attempt to manipulate treatment, (Doc. 1 at 5), the record before this Court is devoid of any physical injury whatsoever. Thus, Plaintiff's Bivens action and FTCA are both entitled to dismissal for Plaintiff's failure to allege a "less-than-significant-but-more-than-*de minimis* physical injury" as a predicate to allegations of emotional injury. Mitchell, 318 F.3d at 536.

## V. Preliminary Injunction

An injunction is an "extraordinary remedy" that is never awarded as of right. Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008).

The United States Court of Appeals for the Third Circuit has delineated four (4) factors that a district court must consider when ruling on a motion for a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured if the court denies the requested relief; (3) whether granting the requested relief will result in even greater harm to the nonmoving party; and (4) whether granting the relief will be in the public interest. See Gerardi v. Pellulo, 16 F.3d 1363, 1373 (3d Cir. 1994); Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 1970–98 (3d Cir. 1990). These same factors are used in considering a motion for temporary restraining order. Bieros v. Nicola, 857 F.Supp. 445, 446 (E.D. Pa. 1994). The moving party has the burden of satisfying these factors. Adams v. Freedom Forge Corp., 204 F.3d 475, 486 (3d Cir. 2000). While each factor need not be established beyond a reasonable doubt, they must combine to show the immediate necessity of injunctive relief. Stilp v. Contino, 629 F.Supp.2d 449, 457 (M.D. Pa. 2009) (citing Swartzwelder v. McNeilly, 297 F.3d 228, 234 (3d Cir. 2002) ). In addition, "[a]s these elements suggest, there must be a 'relationship between the injury claimed in the party's motion and the conduct asserted in the complaint'." Ball v. Famiglio, 396 Fed. App'x 836, 837 (3d Cir. 2010) (quoting Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994) ).

Moreover, the power of a court to issue injunctive relief is also limited and circumscribed by the mootness doctrine. The mootness doctrine recognizes a fundamental truth in litigation: "[i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 698–99 (3d Cir. 1996).

In the instant case, Briggs seeks injunctive relief in the form of a Court ordered psychiatric evaluation by a "psychiatrist", in addition to having his "disciplinary record and sanctions expunged."[5] (Doc. 1). However, Briggs is no longer in BOP custody. Subsequent to the filing of the above captioned action, Plaintiff was released from federal custody to the custody of the Rhode Island Department of Corrections.

---

[5] Additionally, the Court notes that Plaintiff's claim to have his disciplinary record and sanctions expunged is barred by Edwards v. Balisok, 520 U.S. 641 (1997). In Edwards, the Supreme Court extended the rationale in Heck v. Humphrey, 512 U.S. 477 (1994) to disciplinary proceedings, holding that the expungement of the inmate disciplinary proceeding would imply the invalidity of the underlying disciplinary action. Edwards, 520 U.S. 641. The Court stated, "[t]he principal procedural defect complained of by respondent would, if established, necessarily imply the invalidity of the deprivation of his good-time credits." Edwards, 520 U.S. at 646. Accordingly, an inmate may not bring a civil rights action for declaratory and injunctive relief related to an inmate disciplinary proceeding without first challenging and overturning, via appropriate proceedings, the disciplinary hearing in question. Edwards, 520 U.S. at 646-47.

The Third Circuit Court of Appeals has observed that, when addressing inmate requests for injunctive relief:

> As a preliminary matter, we must determine whether the inmates' claims are moot because "a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." Preiser v. Newkirk, 422 U.S. 395, 401 (1975) (quotations omitted); see also, Abdul–Akbar v. Watson, 4 F.3d 195, 206 (3d Cir. 1993). An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims. Abdul–Akbar, 4 F.3d at 197 (former inmate's claim that the prison library's legal resources were constitutionally inadequate was moot because plaintiff was released five months before trial.)

Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003). This Court has previously held, in a case such as the present, where an inmate seeks injunctive relief against his jailers but is no longer housed at the prison where those injunctive claims arose, his transfer to another institution moots any claims for injunctive or declaratory relief. Fortes v. Harding, 19 F.Supp.2d 323, 326 (M.D. Pa. 1998). For these reasons, Plaintiff's claim for preliminary injunctive relief must be denied as moot since he is no longer confined at USP-Lewisburg, and there is no indication that he will be housed at that facility in the foreseeable future.

## VI. <u>Conclusion</u>

Based upon the undisputed facts of record, Defendants' motion to dismiss and for summary judgment will be granted. Plaintiff's motion for summary judgment will be denied.

An appropriate order shall issue.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: March 31, 2021**

19-0319-01

- 50 -